FILED
2022 Aug-22  AM 11:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **CASSANDRA WESLEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **Case No.: 2:20-cv-02073-MHH** |
| **KILOLO KIJAKAZI,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## <u>MEMORANDUM OPINION</u>

Cassandra Wesley seeks judicial review of a final adverse decision of the Commissioner of Social Security Administration pursuant to 42 U.S.C. § 405(g). The Commissioner denied Ms. Wesley's application for disability insurance benefits based on an Administrative Law Judge's decision that Ms. Wesley was not disabled. Ms. Wesley argues that the Administrative Law Judge—the ALJ—erred because the ALJ's reasons for rejecting Ms. Wesley's statements about her pain and limitations are not supported by substantial evidence, and substantial evidence does not support the ALJ's assessment of Ms. Wesley's RFC. After careful review, the Court affirms the Commissioner's decision.

1

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Wesley had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[1]  A claimant must prove that she is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or medically equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited August 9, 2022).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Ms. Wesley applied for disability insurance benefits on September 27, 2018. (Doc. 9-4, pp. 2-3). Ms. Wesley alleged that her disability began on July 31, 2018. (Doc. 9-4, p. 3; Doc. 9-6, p. 5). The Commissioner initially denied Ms. Wesley's claim on February 6, 2019. (Doc. 9-5, pp. 2-7). Ms. Wesley requested a hearing before an ALJ. (Doc. 9-5, pp. 10-11). The ALJ issued an unfavorable decision on April 15, 2020. (Doc. 9-3, pp. 40-55). On April 30, 2020, Ms. Wesley filed exceptions to the ALJ's decision with the Appeals Council. (Doc. 9-5, pp. 63-65). The Appeals Council denied Ms. Wesley's request for review (Doc. 9-3, pp. 2-5), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

*Ms. Wesley's Medical Records*

To support her application, Ms. Wesley submitted medical records dating to 2012 that relate to diagnoses and treatment of sarcoidosis, fibromyalgia, obstructive sleep apnea, degenerative disc disease, generalized anxiety disorder, major depressive disorder, diabetes mellitus, osteoarthritis, high blood pressure, and thyroid removal.[2]  The Court has reviewed Ms. Wesley's complete medical history with a focus on medical records that document her complaints of pain, depression, and anxiety. The following medical evidence is most relevant to Ms. Wesley's arguments for relief from the Commissioner's decision.

On November 4, 2012, Ms. Wesley visited Eastern Medical Specialists. (Doc. 9-8, p. 58).  Ms. Wesley's diagnoses included sarcoidosis, GERD, allergic rhinitis, obesity, and diabetes.  (Doc. 9-8, pp. 58-59).  Ms. Wesley had prescriptions for Ambien, Ativan, Glucophage, Indocin, Zestoretic, Zovirax, and potassium chloride tablets.  (Doc. 9-8, p. 58).  Ms. Wesley reported that she did not have anxiety, depression, chest pain, palpitations, back pain, neck pain, joint pain, muscle pain, or neurological confusion.  (Doc. 9-8, p. 58).  Dr. Jennifer White, the treating physician,

---

[2] Sarcoidosis is "a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of your body — most commonly the lungs and lymph nodes. But it can also affect the eyes, skin, heart and other organs."   https://www.mayoclinic.org/diseases-conditions/sarcoidosis/symptoms-causes/syc-20350358 (last visited Aug. 16, 2022).

reported that Ms. Wesley had normal range of motion, strength, and gait, and no tenderness, swelling, or focal deformities. (Doc. 9-8, p. 59). Dr. White noted that Ms. White's allergic rhinitis was okay, that her GERD was well-controlled, and her sarcoidosis was okay. (Doc. 9-8, p. 59). Dr. White asked Ms. White to monitor her A1c, to continue her medications for her diabetes and GERD, and to return to the clinic in six months. (Doc. 9-8, pp. 59-60).

On August 6, 2013, Ms. Wesley visited Gastroenterology Specialists of Birmingham for an initial visit. She saw Dr. Mukul Mhera. Ms. Wesley complained of bloating, gas, and back pain that had lasted for a year. (Doc. 9-8, p. 166). Ms. Wesley also reported having arthritis, joint pain, neck pain, muscle aches, swelling in her feet and legs, sleep apnea, and anxiety. (Doc. 9-8, p. 167). Dr. Mhera noted that Ms. Wesley presented no evidence of anxiety or depression and that her gait was normal. (Doc. 9-8, p. 168). Dr. Mhera noted also that Ms. Wesley "had pelvic ultrasound which was normal. [I] suspect that her gas and bloating may be from metformin and I will have [her follow up] with Dr. White to see if she can switch this. A[ls]o will schedule colonoscopy at her age. [A]void carbonated drinks. [A]dd align[.]" (Doc. 9-8, p. 168).

On October 14, 2014, Ms. Wesley visited Dr. White at Eastern Medical Specialists. Ms. Wesley reported that she was doing well with her sarcoidosis, diabetes, and GERD, but her allergic rhinitis was worse; she was having green

drainage. (Doc. 9-8, p. 67). Dr. White indicated that Ms. Wesley had no anxiety or depression. Ms. Wesley did not have pain or tenderness in her back, neck, joints, or muscles, and her range of motion, strength, and gait were normal. (Doc. 9-8, pp. 67-68).

Ms. Wesley returned to Eastern Medical Specialists on April 13, 2015, for a six-month follow-up appointment with Dr. White. (Doc. 9-8, p. 70). Ms. Wesley complained of osteoarthritis pain, and she asked Dr. White for medication "to use occasionally." Ms. Wesley reported that she was having some chest pain and that she planned to make an appointment with Birmingham Heart Clinic. (Doc. 9-8, p. 70). Dr. White prescribed Norco for Ms. Wesley to use occasionally, and she indicated that Ms. Wesley's heart had a normal rate and regular rhythm with no murmur, gallop, or edema. (Doc. 9-8, pp. 70-71).

On October 7, 2015, Ms. Wesley returned to Eastern Medical Specialists for a six-month appointment. (Doc. 9-8, p. 73). Dr. White confirmed that Ms. Wesley's diagnoses of allergic rhinitis, diabetes, fibromyalgia, GERD, obesity, osteoarthritis, and sarcoidosis among other ailments. (Doc. 9-8, p. 74). Dr. White indicated that Ms. Wesley's diabetes, osteoarthritis, GERD, and sarcoidosis were okay. (Doc. 9-8, p. 73). Dr. White indicated that Ms. Wesley had no anxiety or depression. (Doc. 9-8, pp. 73-74). Dr. White reported that Ms. Wesley did not complain of back pain,

neck pain, muscle pain, or joint pain, and she had normal range of motion, normal gait, and normal strength. (Doc. 9-8, pp. 73-74).

At Ms. Wesley's next six-month appointment with Dr. White, Dr. White noted that Ms. Wesley's osteoarthritis was okay while Ms. Wesley was on medication. (Doc. 9-8, pp. 76-77). Dr. White indicated that Ms. Wesley's hypertension, diabetes, allergic rhinitis, and GERD were in good condition, and she asked Ms. Wesley to continue her medications and to return to the clinic in six months. (Doc. 9-8, pp. 76-77). At Ms. Wesley's October 5, 2016 appointment, Dr. White noted no abnormal findings relating to Ms. Wesley's psychiatric and musculoskeletal exams. (Doc. 9-8, p. 79). Ms. Wesley reported that her diabetes, osteoarthritis, GERD, sarcoidosis, and hypertension were okay or "good on meds recently." (Doc. 9-8, p. 79). Dr. White asked Ms. Wesley to continue her medications and to return to the clinic in six months. (Doc. 9-8, p. 81).

At Ms. Wesley's March 6, 2017 appointment with Dr. White, Dr. White noted that Ms. Wesley recently had been treated for flu and pneumonia. (Doc. 9-8, p. 82). Dr. White examined Ms. Wesley's respiratory system and found nothing concerning other than a cough. (Doc. 9-8, p. 82).

A few days later, on March 10, 2017, Ms. Wesley visited Dr. Gene Watterson at Alabama Ortho Spine and Sports. (Doc. 9-8, p. 115). The appointment was a return visit. Ms. Wesley reported that she had done well since her last appointment.

(Doc. 9-8, p. 115).  Dr. Watterson noted that Ms. Wesley's overall pain was well-compensated, that she denied depression, and that she was "negative for any motor weakness, ocular inflammatory change, or dyspnea."  (Doc. 9-8, p. 115).  After conducting a physical examination, Dr. Watterson indicated that Ms. Wesley had "no evidence of any peripheral joint rubor, calor, or swelling . . . No synovitis or nodulosis [wa]s noted on global exam.  Multifocal soft tissue palpation tenderness [wa]s present over the anterior/subacromial areas of the shoulders, superior trapezii, and of the trochanteric bursal areas."  (Doc. 9-8, p. 115).  Dr. Watterson noted that Ms. Wesley had a previous diagnosis of sarcoidosis, but "there [wa]s no evidence of expressing clinical features to associate with sarcoidosis."  (Doc. 9-8, p. 115).  Dr. Watterson indicated that Ms. Wesley's fibromyalgia was "somewhat less well-compensated" and noted that compensation could be associated with Ms. Wesley's physiological stress and sleep dysregulation from her recent pneumonia diagnosis. (Doc. 9-8, p. 115).  Dr. Watterson did not make any changes to Ms. Wesley's regimen, but he asked her to return for a follow-up visit in two months. (Doc. 9-8, p. 115).

On March 29, 2017, Ms. Wesley saw Dr. White for a six-month check-up. Dr. White noted that Ms. Wesley's osteoarthritis was okay on Norco and refilled her Norco prescription.  (Doc. 9-8, pp. 85-87).  Dr. White did not mention Ms. Wesley's sarcoidosis or fibromyalgia at this visit, and there is no indication that Dr. White

performed a physical exam.  (Doc. 9-8, pp. 85-87).  Dr. White asked Ms. Wesley to continue her medications and to return to the clinic in six months.  (Doc.9-8, p. 86-87).

On April 14, 2017, Ms. Wesley visited Dr. Maria Johnson at Eastern Pulmonary Sleep and Allergy for a seven-month follow-up appointment.  (Doc. 9-8, p. 45).  Ms. Wesley complained of  significant difficulties with a dry hacking cough and pain in her left rib area and back.  (Doc. 9-8, p. 45).  Ms. Wesley reported that she worked in a musty building.  (Doc. 9-8, p. 45).  Dr. Johnson noted that Ms. Wesley had no musculoskeletal, neurological, or psychological symptoms, but she noted that Ms. Wesley had bronchitis, shortness of breath, and chest pain that could be pleurisy.  (Doc. 9-8, pp. 45-46).  Dr. Johnson listed Ms. Wesley's diagnoses as obstructive sleep apnea, diabetes, osteoarthritis, and sarcoidosis with lung involvement. (Doc. 9-8, p. 45).  Dr. Johnson ordered an x-ray of Ms. Wesley's chest. Dr. Johnson noted that the x-ray "demonstrated changes that have been noticed previously consistent with her sarcoid." (Doc. 9-8, p. 46).  Dr. Johnson stated that there were "really not any new infiltrates.  No effusion.  No masses." (Doc. 9-8, p. 46).  Dr. Johnson prescribed Percocet for pain and a short course of steroids.  (Doc. 9-8, p. 47).  Dr. Johnson asked Ms. Wesley to return in two weeks; Dr. Johnson wanted to "be sure" that Ms. Wesley was "not having a flare-up of her sarcoid." (Doc. 9-8, pp. 46-47).

On May 9, 2017, Ms. Wesley visited Alabama Ortho Spine and Sports for a follow-up appointment with Dr. Watterson. (Doc. 9-8, p. 117). Ms. Wesley reported that she was experiencing some exacerbation in her discomfort with suboptimal relief with muscle relaxers. (Doc. 9-8, p. 117). Dr. Watterson noted that with "careful questioning," Ms. Wesley revealed that she experienced some subjective depression daily but no suicidal ideations. (Doc. 9-8, p. 117). Dr. Watterson reported that Ms. Wesley's neurological system was grossly intact and that her musculoskeletal system showed no evidence of peripheral joint rubor, calor, or swelling. (Doc. 9-8, p. 117). Ms. Wesley had some tenderness over her anterior/subacromial areas of her shoulders, superior trapezii, and trochanteric bursal areas. (Doc. 9-8, p. 117). Dr. Watterson stated that Ms. Wesley's fibromyalgia was "characteristically and significantly symptomatic." (Doc. 9-8, p. 117). Dr. Watterson noted that treating Ms. Wesley's depression would be very important to help her achieve better sleep, which in turn would aid in the treatment of her fibromyalgia. (Doc. 9-8, p. 117). Dr. Watterson prescribed 20 mg of citalopram and substituted orphenadrine for methocarbamol. (Doc. 9-8, p. 117).[3] Dr. Watterson asked Ms. Wesley to return in six weeks. (Doc. 9-8, p. 117).

---

[3] "Citalopram is used to treat depression, including major depressive disorder []. It is an antidepressant that belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs)." https://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980#:~:text=Citalopram%20is%20used%20to%20treat,called%20serotonin%20in%20the%20brain. (last visited August 10, 2022). Orphenadrine "is used to help relax certain muscles in

On May 12, 2017, Ms. Wesley returned to see Dr. Maria Johnson at Eastern Pulmonary Sleep and Allergy. (Doc. 9-8, p. 42). Ms. Wesley reported that her chest pain had improved. (Doc. 9-8, p. 42). Dr. Johnson noted that Ms. Wesley had an enlarged thyroid and thyroid nodules. (Doc. 9-8, p. 42). Ms. Wesley was working full time. (Doc. 9-8, p. 42).[4] Dr. Johnson directed Ms. Wesley to continue her treatment regimen and to return in six months. (Doc. 9-8, p. 43).

On May 16, 2017, Ms. Wesley had a total thyroidectomy without complications. (Doc. 9-8, p. 9). Ms. Wesley had a history of thyroid nodules and had been diagnosed with hyperthyroidism. (Doc. 9-8, p. 10). Following her surgery, Ms. Wesley did well. (Doc. 9-8, pp. 16, 119).

Ms. Wesley visited Alabama Ortho Spine and Sports for a follow-up visit with Dr. Watterson on July 5, 2017. (Doc. 9-8, p. 119). Dr. Watterson noted that Ms. Wesley's pain was overall reasonably well-compensated. (Doc. 9-8, p. 119). He noted that Ms. Wesley had a brighter affect while taking the citalopram and that there was no sign of subjective depression. (Doc. 9-8, p. 119). Ms. Wesley reported some improvement in discomfort with her use of orphenadrine. (Doc. 9-8, p. 119). Dr. Watterson noted the same neurological and musculoskeletal findings from Ms.

---

your body and relieve the stiffness, pain, and discomfort caused by strains, sprains, or other injury to your muscles." https://www.mayoclinic.org/drugs-supplements/orphenadrine-oral-route/description/drg-20065214 (last visited August 10, 2022).

[4] Evidence in the record indicates that Ms. Wesley worked for AT&T for 30 years until she retired in 2018 a few weeks before her fiftieth birthday. (Doc. 9-8, p. 169).

Wesley's previous examination. (Doc. 9-8, p. 119). Dr. Watterson also noted that Ms. Wesley's fibromyalgia was well-compensated overall. (Doc. 9-8, p. 119).

Ms. Wesley returned to Alabama Ortho Spine and Sports on September 22, 2017. Ms. Wesley complained that she had been in pain for three weeks. (Doc. 9-8, p. 120). She reported being "under greater situational stress" than normal and indicated that she had been experiencing subjective depression without suicidal ideations. (Doc. 9-8, p. 120). Dr. Watterson noted that Ms. Wesley had no evidence of active sarcoidosis, but her fibromyalgia was somewhat less well-compensated. (Doc. 9-8, p. 120). Dr. Watterson discussed with Ms. Wesley how "achieving a state of adequate therapeutic benefit with respect to treatment of clinical depression [would] remain an important factor with respect to hopefully achieving a state of restorative sleep and treatment of fibromyalgia-associated pain." (Doc. 9-8, p. 120). Dr. Watterson increased Ms. Wesley's citalopram to 40 mg per day. (Doc. 9-8, p. 120). Dr. Watterson asked Ms. Wesley to return in six weeks. (Doc. 9-8, p. 120).

Ms. Wesley returned to see Dr. White on September 27, 2017 for a six-month check-up. (Doc. 9-8, p. 88). Ms. Wesley's osteoarthritis was "ok on meds" and her sarcoidosis was "ok recently." (Doc. 9-8, p. 90). Dr. White asked Ms. Wesley to return in six months. (Doc. 9-8, p. 90).

On November 3, 2017, Ms. Wesley visited Alabama Ortho Spine and Sports. She complained of discomfort in her ankles. (Doc. 9-8, p. 121). Dr. Watterson noted

that Ms. Wesley's musculoskeletal examination revealed "tenderness in the feet/ankles [but] no acute deformity.  There is equivocal edema in the anterolateral aspects of the ankles bilaterally."  (Doc. 9-8, p. 121).  Other than that, there was no evidence of peripheral joint rubor, calor, or swelling. (Doc. 9-8, p. 121).  Dr. Watterson noted that sarcoidosis tended to be associated with inflammation in the ankles and suggested that Ms. Wesley undergo regional radiography and bilateral MRI imaging, but Ms. Wesley declined.  (Doc. 9-8, p. 121).  Dr. Watterson noted that Ms. Wesley's fibromyalgia was reasonably well-compensated, and he refilled Ms. Wesley's prescriptions for citalopram and methocarbamol; he made no changes to Ms. Wesley's medication regimen.  (Doc. 9-8, p. 121).  At Ms. Wesley's follow-up appointment on November 22, 2017, she reported that she had not experienced significant pain since her last visit.  (Doc. 9-8, p. 123).  Her fibromyalgia was reasonably well-compensated, her sarcoidosis presented no clear evidence of activity, and her labs were unremarkable.  (Doc. 9-8, p. 123).

Ms. Wesley returned to Alabama Ortho Spine and Sports on February 23, 2018.  (Doc. 9-8, p. 124).  Ms. Wesley reported that her pain since her last visit had been overall reasonably well-managed with the use of methocarbamol to treat occasional discomfort.  (Doc. 9-8, p. 124).  Ms. Wesley denied motor weakness, dyspnea, and subjective depression, but she reported some short-term memory problems.  (Doc. 9-8, p. 124).  Dr. Watterson made no changes to Ms. Wesley's

fibromyalgia regimen and found no clear evidence of sarcoidosis activity. Dr. Watterson indicated that he would have Ms. Wesley undergo an evaluation for her short-term memory impairment. (Doc. 9-8, p. 124).

On March 22, 2018, Ms. Wesley visited Dr. White at Eastern Medical Specialists for a follow-up appointment. (Doc. 9-8, p. 91). Dr. White reported that Ms. Wesley's musculoskeletal and neurological systems were normal and that she had no anxiety or depression. (Doc. 9-8, p. 91). Dr. White noted that Ms. Wesley's sarcoidosis was okay. (Doc. 9-8, p. 93).

On April 10, 2018, Ms. Wesley visited St. Vincent's East for an MRI of her brain to evaluate it for sarcoidosis. (Doc. 9-8, p. 6). Dr. Patrick Druhan, the radiologist, compared Ms. Wesley's MRI to an MRI of her brain from November 24, 2009. Dr. Patrick Druhan noted no intercranial abnormality or abnormal enhancement. (Doc. 9-8, p. 6).

On May 7, 2018, Ms. Wesley saw Dr. Johnson at Eastern Pulmonary Sleep and Allergy. (Doc. 9-8, p. 39). Ms. Wesley reported significant difficulties with chest and joint pain which she believed to be associated with her sarcoid, but Ms. Wesley reported that she was doing "fairly well[.]" (Doc. 9-8, p. 39). Dr. Johnson noted that Ms. Wesley had fibromyalgia and occasional skin lesions. (Doc. 9-8, p. 39). Dr. Johnson indicated that Ms. Wesley was experiencing muscle aches, arthralgias, chest pain, and dyspnea. (Doc. 9-8, p. 40). Dr. Johnson noted no

neurological or psychological symptoms.  (Doc. 9-8, p. 40).  Dr. Johnson listed Ms. Wesley's diagnoses as obstructive sleep apnea, Type 2 diabetes, osteoarthritis, and sarcoidosis with skin and lung involvement.  (Doc. 9-8, p. 39).  Dr. Johnson prescribed prednisone to treat Ms. Wesley's sarcoidosis-related joint pain, she asked Ms. Wesley to continue Dulera to treat her asthma which was stable, and she prescribed new CPAP supplies for Ms. Wesley's sleep apnea. (Doc. 9-8, p. 41).  Dr. Johnson noted that Ms. Wesley's chest pain was likely associated with her sarcoidosis and that Ms. Wesley was under the care of a rheumatologist for her fibromyalgia.  (Doc. 9-9, p. 41).

Ms. Wesley visited Alabama Ortho Spine and Sports on May 18, 2018.  (Doc. 9-8, p. 125).  Dr. Watterson noted that Ms. Wesley underwent evaluation for her memory issues and that the issues were possibly associated with Ms. Wesley's sleep apnea syndrome.  (Doc. 9-8, p. 125).  Dr. Watterson indicated that Ms. Wesley's neurological system was grossly intact, her musculoskeletal exam presented no evidence of peripheral joint rubor, calor, or swelling, and that she denied depression.  (Doc. 9-8, p. 125).  Ms. Wesley's fibromyalgia was overall well-compensated, and there was no evidence of active sarcoidosis.  (Doc. 9-8, p. 125).

Ms. Wesley had a six-month follow-up appointment with Dr. Farah Javed at The Endocrine Diabetes and Metabolism Clinic on July 11, 2018.  (Doc. 9-8, p. 107).  Ms. Wesley reported that she was having chest palpitations and symptoms of

anxiety; she denied chest pain and pressure.  (Doc. 9-8, pp. 107-108).  Ms. Wesley denied muscle and joint pain, spasms, swelling, stiffness,  memory loss, insomnia, or depression.  (Doc. 9-8, p. 108).  Dr. Javed noted that Ms. Wesley reported that she had fair control of her diabetes, and he asked Ms. Wesley to continue metfomin. (Doc. 9-8, p. 109).

In August in 2018, Ms. Wesley visited Alabama Ortho Spine and Sports four times.  (Doc. 9-8, pp. 126-34).  Three of the visits were with Dr. Mallempati to address pain.  On August 3, 2018, Ms. Wesley complained that she had been experiencing acute chronic low back pain that radiated down to her buttocks area for three months; the onset of symptoms was gradual.  (Doc. 9-8, p. 126).  Ms. Wesley reported that she had 9/10 pain that she described as severe, constant, burning, sharp, stabbing, throbbing, and radiating.  (Doc. 9-8, p. 126).  Ms. Wesley explained that her symptoms did not change from day to night and that activity, climbing stairs, walking, and working aggravated her symptoms.  (Doc. 9-8, p. 126).  Ms. Wesley explained also that "she had prior treatment for this orthopedic problem[,]" and she reported that ice, heat, pain medication, topical creams, physical therapy, home exercise, and NSAIDs did not change her symptoms.  (Doc. 9-8, p. 126).

Ms. Wesley's lumbar examination revealed normal lumbar alignment, normal muscle strength and tone, normal sensation to touch, and equal knee and ankle reflexes, but there was tenderness around her midline and paraspinal area, limitations

in her range of motion, and a positive straight leg raise test. (Doc. 9-8, p. 127). Dr. Mallempati took x-rays of Ms. Wesley's lumbar spine and gave her a steroid injection to help with her pain. (Doc. 9-8, p. 127). Ms. Wesley's x-rays revealed mild degenerative disc disease at her L4 and L5 discs. (Doc. 9-8, p. 127). Dr. Mallempati ordered an MRI of Ms. Wesley's lumbar spine "to rule out disc herniation or central canal or neuroforaminal stenosis." (Doc. 9-8, p. 127).

Ms. Wesley returned to Alabama Ortho Spine and Sports on August 7, 2018 for her MRI results. Ms. Wesley reported that her symptoms had deteriorated. (Doc. 9-8, p. 128). Ms. Wesley explained that her symptoms improved with heat, NSAIDs, topical creams, and the steroid injections, but ice, physical therapy, and home exercise programs did not help. (Doc. 9-8, p. 128). Ms. Wesley's lumbar examination results were unchanged. (Doc. 9-8, p. 129). Ms. Wesley's MRI revealed mild central canal stenosis at L2-3, mild left foraminal and central canal stenosis at L3-4, moderate central canal and bilateral mild foraminal stenosis at L4-5, and mild concentric disc bulging and bilateral mild foraminal stenosis at L5-S1. (Doc. 9-8, p. 145). Dr. Mallempati noted that Ms. Wesley's gait and station were normal but explained that pain was causing "functional impairment in activities of daily living." (Doc. 9-8, p. 129). The following day, Ms. Wesley received an interlaminar epidural steroid injection at her L4-5 discs on the left side of her spine. (Doc. 9-8, pp. 129, 131).

Ms. Wesley returned to Alabama Ortho Spine and Sports on August 13, 2018 to see Dr. Watterson.  (Doc. 9-8, p. 133).  Ms. Wesley reported that she was still having discomfort, but she explained that her pain improved following the epidural injection.  (Doc. 9-8, p. 133).  Ms. Wesley reported experiencing some subjective depression.  (Doc. 9-8, p. 133).  Dr. Watterson noted that Ms. Wesley's fibromyalgia was less well-compensated, but he wanted to have a creatine phosphokinase test and an acute phase reactant study done to evaluate her pain.  (Doc. 9-8, p. 133).  Dr. Watterson also ordered Ms. Wesley to undergo a psychiatric evaluation to address her depression.  (Doc. 9-8, p. 133).

On August 21, 2018, Ms. Wesley had a psychiatric evaluation at Grayson & Associates.  Ms. Wesley was diagnosed with general anxiety disorder and major depressive disorder.   (Doc. 9-8, pp. 153-54).   Ms. Wesley's memory and concentration were impaired.  (Doc. 9-8, p. 154).  Ms. Wesley rated her back pain 6/10.  (Doc. 9-8, p. 154).  The treating psychiatrist recommended that Ms. Wesley decrease her citalopram to 20 mg and to start 30 mg of duloxetine per day.  (Doc. 9-8, p. 154).

Ms. Wesley returned to Grayson & Associates on September 4, 2018 for a follow-up visit.  Ms. Wesley reported that she was less depressed and in less pain, but she still was experiencing anxiety.  (Doc. 9-8, p. 151).  The psychiatrist described Ms. Wesley as cooperative, alert, and logical, but he noted that her attention and

concentration were distracted and hyper-focused.  (Doc. 9-8, pp. 151–52).  The psychiatrist recommended that Ms. Wesley discontinue citalopram and Ambien, and he asked her to take 30 mg duloxetine/Cymbalta in the morning and 60 mg at night and to take 50 mg of trazodone at night.  (Doc. 9-8, p. 152).

Ms. Wesley returned to Alabama Ortho Spine and Sports on September 24, 2018.  Ms. Wesley complained of moderate pain, but her affect was brighter.  (Doc. 9-8, p. 135).  Dr. Watterson noted that Ms. Wesley's fibromyalgia was moderately-compensated and that there was no clear evidence of sarcoidosis disease.  (Doc. 9-8, p. 135).  Dr. Watterson indicated that Ms. Wesley could increase her dosage of methocarbamol to 500 mg for her discomfort.  (Doc. 9-8, p. 135).

On October 4, 2018, Ms. Wesley visited Grayson & Associates for a follow-up visit.  Ms. Wesley ranked her depressed mood as 3/10, and she reported that her low energy and interests were getting a "little better[.]"  (Doc. 9-8, p. 150).  Ms. Wesley reported that she was having anxious feelings and focus and sleep problems.  (Doc. 9-8, p. 150).  The psychiatrist instructed Ms. Wesley to begin taking Ambien again.  (Doc. 9-8, p. 150).  Ms. Wesley reported that she was experiencing 6/10 muscular pain.  (Doc. 9-8, p. 150).

On November 1, 2018, Ms. Wesley visited The Endocrine Diabetes and Metabolism Clinic for a follow-up appointment.  (Doc. 9-8, p. 110).  Dr. Javed

indicated that Ms. Wesley had muscle and joint pain and depression. Ms. Wesley denied memory loss, anxiety, and insomnia. (Doc. 9-8, p. 111).

On November 19, 2018, Ms. Wesley visited Alabama Ortho Spine and Sports after falling and injuring her right arm. (Doc. 9-8, p. 137). Ms. Wesley rated her pain as a 10/10 and described it as severe, constant, throbbing, and radiating. (Doc. 9-8, p. 141). Ms. Wesley reported that movement made her symptoms worse, and heat made her symptoms better. (Doc. 9-8, p. 141). Ms. Wesley reported "swelling, ROM limitation, sleep disturbances and catching/locking." (Doc. 9-8, p. 141). Dr. Watterson ordered x-rays of Ms. Wesley's right shoulder and cervical spine. The x-rays revealed mild degenerative changes in her cervical spine, acromioclavicular osteoarthritis, and mild glenohumeral changes in her right shoulder but no obvious fractures. (Doc. 9-8, p. 142). Ms. Wesley received an injection in her shoulder for her pain. (Doc. 9-8, p. 142).

On December 5, 2018, Ms. Wesley visited Grayson & Associates for a follow-up visit. (Doc. 9-8, p. 148). Ms. Wesley reported a depressed mood, episodes of being down for a few weeks, and anxious feelings. (Doc. 9-8, p. 148). Ms. Wesley also reported that she was having trouble focusing because of her short-term memory and concentration issues. (Doc. 9-8, p. 148). The psychiatrist noted that Ms. Wesley had a brighter effect and categorized Ms. Wesley's attention and concentration as distracted and her memory as immediately impaired. (Doc. 9-8, p. 149).

On January 10, 2019, Ms. Wesley visited The Endocrine Diabetes and Metabolism Clinic for a follow-up visit. (Doc. 9-8, p. 175). Ms. Wesley complained of muscle pain due to fibromyalgia and right shoulder pain from her fall. (Doc. 9-8, p. 175). Ms. Wesley reported that her pain was improving through physical therapy and an increase in the dosage of her Cymbalta. (Doc. 9-8, p. 175). Ms. Wesley reported arthralgias and muscle pain, but she denied having joint swelling and pain, memory loss, headaches, anxiety, insomnia, and depression. (Doc. 9-8, p. 176).

On February 21, 2019, Ms. Wesley visited Alabama Ortho Spine and Sports complaining that she still was experiencing pain and that methocarbamol was not significantly improving her pain. (Doc. 9-9, p. 2). Ms. Wesley denied having depression while using 60 mg of Cymbalta. (Doc. 9-9, p. 2). Dr. Watterson reported that Ms. Wesley's musculoskeletal exam produced no evidence of peripheral joint rubor, calor, or swelling. (Doc. 9-9, p. 2). He also noted that multifocal soft tissue palpation tenderness was present over Ms. Wesley's anterior/subacromial areas of her shoulders, superior trapezii, and trochanteric bursal areas. (Doc. 9-9, p. 2). He described Ms. Wesley's fibromyalgia as "continuing characteristically and significantly-symptomatic" and prescribed 100 mg of Neurontin. (Doc. 9-9, p. 2).

On March 5, 2019, Ms. Wesley visited Grayson & Associates for a psychiatry follow-up visit. (Doc. 9-9, p. 37). Ms. Wesley reported that her depression was better on the increased dosage of Cymbalta. (Doc. 9-9, p. 37). She reported that she

was still having memory problems and joint and muscle pain.  (Doc. 9-9, p. 37).  The psychiatrist indicated that Ms. Wesley's mood was depressed, her speech was pressured, her thought process was logical, her attention and concentration were distracted, and her memory had an immediate impairment.  (Doc. 9-9, p. 38).  The psychiatrist also noted that Ms. Wesley needed physical therapy for her fibromyalgia.  (Doc. 9-9, p. 38).

The next day, Ms. Wesley visited Dr. Johnson at Eastern Pulmonary Sleep and Allergy for a nine-month follow-up appointment.  (Doc. 9-8, p. 195).  Ms. Wesley reported having insomnia, fatigue, joint problems, muscle aches and arthralgia, sleep disturbances, and dyspnea.  (Doc. 9-8, pp. 195-96).  Dr. Johnson indicated that Ms. Wesley had no neurological symptoms.  (Doc. 9-8, p. 196).

A week later, Ms. Wesley returned to The Endocrine Diabetes and Metabolism Clinic for a follow-up appointment.  (Doc. 9-8, p. 180).  Dr. Javed noted that Ms. Wesley had a rash and some lesions, but she denied arthralgia, muscle pain, joint pain, spasms, stiffness, joint swelling, memory loss, anxiety, insomnia, and depression.  (Doc. 9-8, p. 181).

On April 3, 2019, Ms. Wesley visited Dr. Johnson at Eastern Pulmonary Sleep and Allergy with a complaint that she was not doing well.  (Doc. 9-8, p. 192).  Ms. Wesley explained that she felt short of breath, chest discomfort, significant fatigue, pain on inspiration, and arthralgias in the muscles.  (Doc. 9-8, pp. 192-93).  Dr.

Johnson ordered a chest x-ray, which showed no evidence of a new infiltrate, pneumonia, or effusion.  (Doc. 9-8, p. 193).  Dr. Johnson determined that Ms. Wesley had mild persistent asthma, fibromyalgia that added to Ms. Wesley's difficulties with arthralgias and fatigue, and sarcoidosis with worsening symptomatology, noting that she was going to "reevaluate and be sure that [Ms. Wesley did] not have any superimposed infection zone . . . going to evaluate [Ms. Wesley] further with a CT scan of the thorax with contrast."  (Doc. 9-8, pp. 193-94). Ms. Wesley visited Dr. Johnson again on April 8, 2019.  Ms. Wesley reported that she felt a little better, but she still felt poorly with shortness of breath.  (Doc. 9-8, p. 189).  The CT scan revealed "[t]here [were] some little areas of pneumonitis, but overall, the CT of the chest appear[ed] improved over previous CT scans.  There [was] not any effusion.  There [was] stable adenopathy.  However, there seem[ed] to be fatty infiltration of the liver with some nodularity."  (Doc. 9-8, p. 190).  Dr. Johnson determined that Ms. Wesley's sarcoidosis was stable, but she explained that Ms. Wesley's liver condition could be caused by her sarcoidosis.  (Doc. 9-8, p. 190). Dr. Johnson also opined that Ms. Wesley's obstructive sleep apnea was stable, chest pain was improving, and mild persistent asthma was stable.  (Doc. 9-8, p. 190).

On April 22, 2019, Ms. Wesley visited Alabama Ortho Spine and Sports. (Doc. 9-9, p. 3).  Ms. Wesley reported her pain was better and her sleep was more restorative.   Ms. Wesley denied subjective depression and described her

23

fibromyalgia as overall improved clinically.  (Doc. 9-9, p. 3).  Dr. Watterson noted that Ms. Wesley had multifocal soft tissue palpation tenderness present over the subacromial areas of the shoulders and left trochanteric bursal areas and mild bilateral parasternal discomfort present with palpation.  (Doc. 9-9, p. 3).  Ms. Wesley had a follow-up visit with Dr. Watterson on June 3, 2019.  (Doc. 9-9, p. 71).  Dr. Watterson noted that Ms. Wesley had no evidence of peripheral joint rubor, calor, or swelling, but she had focal soft tissue palpation tenderness present in the anterior aspects of her shoulders, subacromial regions, and superior trapezii.  (Doc. 9-9, p. 71).  Ms. Wesley's fibromyalgia was reasonably well-managed, and there was no clear evidence of expressing sarcoidosis.  (Doc. 9-9, p. 71).

Ms. Wesley visited Grayson & Associates on June 5, 2019.  Ms. Wesley reported feeling okay; she felt less depressed and anxious, but she was still having focus problems.  (Doc. 9-9, p. 35).  The psychiatrist described Ms. Wesley as guarded, with a neutral mood, logical thought process, congruent affect, and intact memory, attention, and concentration.  (Doc. 9-9, p. 36).  On August 28, 2019, Ms. Wesley returned to Grayson & Associates reporting that she was in an okay mood, but she reported feeling depressed with low energy.  Ms. Wesley explained that she had been secluded at home for a month.  (Doc. 9-9, p. 33).  Ms. Wesley reported that she was having focus problems and decreased attention.  (Doc. 9-9, p. 33).  The psychiatrist described Ms. Wesley as guarded, malodorous, depressed, and

distracted, but her affect was congruent, her thought process was logical and appropriate, and she was alert.  (Doc. 9-9, p. 34).

On September 6, 2019, Ms. Wesley visited Dr. Johnson at Eastern Pulmonary Sleep and Allergy for a five-month follow-up appointment.  (Doc. 9-9, p. 61).  Ms. Wesley complained that she had not been doing well.  Ms. Wesley reported feeling very tired and run down.  (Doc. 9-9, p. 61).  Ms. Wesley denied muscle aches or weakness or joint problems.  (Doc. 9-9, p. 61).  Ms. Wesley reported that she had visited her primary care physician a couple months before, and she was told her blood sugar, cholesterol, and calcium were elevated.  (Doc. 9-9, p.61).  Dr. Johnson noted that she would reassess Ms. Wesley's sarcoid and check her ACE level, calcium level, and liver studies.  (Doc. 9-9, p. 63).[5]  Dr. Johnson asked Ms. Wesley to return in one month. (Doc. 9-9, p. 63).

On September 16, 2019, Ms. Wesley visited Alabama Ortho Spine and Sports for a follow-up appointment.  (Doc. 9-9, p. 73).  Ms. Wesley reported that her discomfort increased after she started taking pravastatin about one month before her appointment.  (Doc. 9-9, p. 73).  Dr. Watterson noted that Ms. Wesley had tenderness in her shoulders.   Dr. Watterson opined that there was no clear evidence of

_____

[5] ACE, "[t]he angiotensin converting enzyme [] [,] is an enzyme that converts angiotensin I to angiotensin II.  Angiotensin II helps increase blood pressure by causing small blood vessels in the body to tighten or narrow."  https://www.healthline.com/health/ace-levels (last visited August 12, 2022).

sarcoidosis activity per his clinical evaluation and that Ms. Wesley's fibromyalgia was moderately-compensated. (Doc. 9-9, p. 73). He noted that Ms. Wesley would confer with the doctor that prescribed pravastatin about her worsening fibromyalgia pain. (Doc. 9-9, p. 73).

Ms. Wesley returned to Dr. Johnson at Eastern Pulmonary Sleep and Allergy on October 9, 2019 for a follow up appointment. (Doc. 9-9, p. 64). Ms. Wesley was feeling better and in good spirits. (Doc. 9-9, p. 64). Ms. Wesley reported that her calcium level and A1c had decreased. (Doc. 9-9. 64). A review of Ms. Wesley's body systems indicated that she was having muscle aches, arthralgia, and dyspnea, but she had no neurological or psychological symptoms. (Doc. 9-9, p. 65).

On October 21, 2019, Ms. Wesley visited Grayson & Associates complaining that she was worse. (Doc. 9-9, p. 31). Ms. Wesley reported depressed moods, low energy, low interest, irritability, anxious feelings, sleep disturbance, focus problems, confusion, and forgetfulness. (Doc. 9-9, p. 31). Ms. Wesley explained that she felt confused, and she forgot to pay her bills. (Doc. 9-9, p. 31). The psychiatrist noted that Ms. Wesley was depressed, anxious, confused, crying, distracted, inattentive, and perseverative, and she had poor insight and judgment. (Doc. 9-9, p. 32). Because Ms. Wesley was confused about her medication, it was not clear if she was taking Cymbalta. (Doc. 9-9, pp. 31-32).

On November 4, 2019, Ms. Wesley returned to Grayson & Associates for a follow-up visit.  (Doc. 9-9, p. 29).  Ms. Wesley reported depressed moods, low energy, low interest, anxious feelings, panic attacks, and a decline in her memory.  (Doc. 9-9, p. 29).  The psychiatrist described Ms. Wesley as cooperative, depressed, logical, forgetful, and inattentive with an immediate memory impairment and poor insight and judgement.  (Doc. 9-9, p. 30).

Ms. Wesley visited Alabama Ortho Spine and Sports on November 11, 2019.  (Doc. 9-9, p. 75).  Ms. Wesley reported that her previous discomfort had improved overall, and she denied subjective depression.  (Doc. 9-9, p. 75).  Dr. Watterson noted that Ms. Wesley continued to take pravastatin and use her CPAP which promoted restorative sleep.  (Doc. 9-9, p. 75).  Dr. Watterson indicated no abnormal findings from Ms. Wesley's physical examination.  (Doc. 9-9, p. 75).  Ms. Wesley's sarcoidosis labs showed no evidence of active issues pertaining to the disease, and her fibromyalgia was "[o]verall reasonably well-compensated."  (Doc. 9-9, p. 75).

Ms. Wesley had an appointment with Dr. Johnson on February 20, 2020.  Ms. Wesley reported that she was doing well with her breathing issues, but she reported that her primary care physician and OB/GYN notified her that she had "some abnormal hepatitis serologies so she ha[d] been referred to Dr. Mehra for further evaluation."  (Doc. 9-3, p. 38).  Ms. Wesley reported that she had arthralgias in the knees and ankles, but Dr. Johnson noted that Ms. Wesley had no edema and that Ms.

Wesley had normal motor strength in her upper and lower extremities.  (Doc. 9-3, p. 38).

Ms. Wesley visited Alabama Ortho Spine and Sports and The Birmingham Heart Clinic on March 17, 2020.  (Doc. 9-3, pp. 60, 62).  Ms. Wesley reported to Dr. Watterson that her prior discomfort had been reasonably well-compensated.  (Doc. 9-3, p. 60).  Dr. Watterson noted no new findings regarding Ms. Wesley's physical examination, sarcoidosis, and fibromyalgia.  (Doc. 9-3, p. 60).  Dr. Watterson asked Ms. Wesley to go to Birmingham Heart Clinic because of "skipped beats heard on exam."  (Doc. 9-3, p. 62).  At the Birmingham Heart Clinic, Ms. Wesley reported chest pain, fatigue, and weakness, but she denied joint swelling, muscular weakness, anxiety, and depression.  (Doc. 9-3, p. 63).  Ms. Wesley had a Lexiscan Stress MPI study at Birmingham Heart Clinic on March 27, 2020.  (Doc 9-3, p. 66).  The pharmacologic stress study was normal, but the nuclear portion of the study had a degraded quality due to "large body habitus, breast attenuation."  (Doc. 9-3, p. 66).[6]  Ms. Wesley's ejection fraction was 62%.  (Doc. 9-3, p. 66).[7]

---

[6] "Large body habitus is often used by radiologists as a euphemism for overweight/obese patients in radiology reports, usually in reference to its deleterious effect on image quality, sometimes it maybe   [sic]   expressed   as   'large   body   habitus   artifact[.]'" https://radiopaedia.org/articles/obesity?lang=us#:~:text=Large%20body%20habitus%20is%20often,large%20body%20habitus%20artifact%2014. (last visited August 12, 2022).

[7] "Ejection fraction (EF) is a measurement, expressed as a percentage, of how much blood the left ventricle pumps out with each contraction. An ejection fraction of 60 percent means that 60 percent of the total amount of blood in the left ventricle is pushed out with each heartbeat . . . A normal heart's ejection fraction may be between 50 and 70 percent."   https://www.heart.org/en/health-

Ms. Wesley visited Alabama Ortho Spine and Sports on April 28, 2020.  (Doc. 9-3, p. 28).  Ms. Wesley reported that she had some lower back pain that radiated to her legs.  Ms. Wesley reported also that she had some paresthesia in her hands at night.  Ms. Wesley explained that she had not injured herself before the onset of the symptoms.  (Doc. 9-3, p. 28).  Dr. Watterson noted that "[t]here was no constraint in range of motion [] with passive ranging.  No spasm, crepitus, or instability [wa]s identified.  Mild to moderate discomfort [wa]s present with extension of the neck with past arranged otherwise nonprovocative of pain."  (Doc. 9-3, p. 28).  As was the case with most of her other visits, Ms. Wesley had some tenderness around her shoulder area.   (Doc. 9-3, p. 28).  Dr. Watterson indicated that there was no clear evidence of sarcoidosis activity, and Ms. Wesley's fibromyalgia was moderately-compensated.  (Doc. 9-3, p. 28).  Dr. Watterson noted that Ms. Wesley would need to undergo reevaluation for her cervicalgia and lower back pain, and he noted that her hand paresthesia was consistent with the presence of "bilateral median neuropathy."  Dr. Watterson asked Ms. Wesley to wear a splint on both wrists. (Doc. 9-3, p. 28).

The following day, Ms. Wesley had an appointment with Dr. Mallempati at Alabama Ortho Spine and Sports because of pain in her neck and lower back.  (Doc.

_____

topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-measurement          (last visited August 18, 2022).

9-3, p. 30).   Ms. Wesley rated her pain as 8/10 and "describe[d] the symptoms as constant and throbbing."   Ms. Wesley explained that her symptoms did not change from day to night, and they caused difficulty with walking, sleep disturbances, and weakness.   (Doc. 9-3, p. 30).   Ms. Wesley reported that her symptoms were aggravated by activity, walking, and chores.   (Doc. 9-3, p. 30).   Ms. Wesley explained that her symptoms were relieved with resting, sitting, medication, changing positions, and the application heat. (Doc. 9-3, pp. 30, 31).   Ms. Wesley's lumbar examination revealed normal lumbar alignment, normal muscle strength and tone, normal sensation to touch, and equal knee and ankle reflexes.   Ms. Wesley had tenderness around the midline and paraspinal areas, and her range of motion was limited with lumbar flexion, extension, and rotation.   (Doc. 9-3, p. 31).   Ms. Wesley's gate and station were normal, and she could walk unassisted.   (Doc. 9-3, p. 31).   Ms. Wesley received an epidural block on her right L4/L5 discs.   (Doc. 9-3, p. 32).   Dr. Mallempati noted that Ms. Wesley experienced a spike in her blood sugar with steroids; therefore, he lowered the dosage.   (Doc. 9-3, p. 32).

On May 20, 2020, Ms. Wesley went to Eastern Pulmonary Sleep and Allergy for a follow-up appointment.   (Doc. 9-3, p. 36).   Ms. Wesley reported palpitations, but she appeared to be in no acute distress.   (Doc. 9-3, p. 36).   Ms. Wesley denied having anxiety and depression, but she reported muscle and joint aches and pains and arthralgia.   (Doc. 9-3, p. 37).   Dr. Johnson noted that Ms. Wesley was alert,

oriented, cooperative, and pleasant.  Dr. Johnson indicated that Ms. Wesley had mild edema in her ankles, but she had normal strength in her upper and lower extremities. (Doc. 9-3, p. 36).

### *Dr. Brian McFarland's Psychological Evaluation*

On January 30, 2019, at the request of Disability Determination Services, Ms. Wesley visited McFarland Consulting for a psychological evaluation with Dr. Brian Robert McFarland.  (Doc. 9-8, p. 169).  Ms. Wesley reported that she performed all basic activities of daily living independently.  (Doc. 9-8, p. 170).  Ms. Wesley explained that she could drive, but she left the house only when she had to because she worried about "everything going on" and got lost easily.  (Doc. 9-8, p. 170).  Ms. Wesley reported that she went to the grocery store twice a month and cooked about twice a week.  (Doc. 9-8, p. 170).  She reported that she did laundry, but she explained that she needed to complete it in one day because if she stopped, she would not have the energy to start again.  (Doc. 9-8, p. 170).  Ms. Wesley reported that she did housework twice a week, but she no longer completed chores that involved bending over.  (Doc. 9-8, p. 170).  Ms. Wesley managed her medications and the family finances.  (Doc. 9-8, p. 170).  Ms. Wesley reported that she limited her social life to attending an early, uncrowded Sunday morning church service, checking on her aging parents, and spending time with her grandsons when they visited.  (Doc. 9-8, p. 170).

Dr. McFarland described Ms. Wesley's mood as "pretty level" and her affect as mildly constricted and briefly tearful. (Doc. 9-8, p. 170). Dr. McFarland noted that Ms. Wesley was fully oriented and that she completed four of the five attention and concentration tasks correctly. (Doc. 9-8, p. 170). Ms. Wesley could immediately recall a three-item word list, but after a delay, she recalled only one of the words. (Doc. 9-8, p. 170). Dr. McFarland indicated that Ms. Wesley's thought process was grossly organized without evidence of loose associations or flight of ideas and with no abnormalities with her thought content. (Doc. 9-8, p. 171).

Dr. McFarland noted that he reviewed and considered the medical records DDS provided. Dr. McFarland concluded that Ms. Wesley would have mild to moderate limitations in her ability to understand, carry out, and remember instructions; respond appropriately to supervision and coworkers; and tolerate work pressures in a work setting. (Doc. 9-8, p. 171). Dr. McFarland diagnosed Ms. Wesley with generalized anxiety disorder with panic attacks and mild single episode major depressive disorder, "in addition to multiple physical issues." (Doc. 9-8, p. 171). Dr. McFarland anticipated no significant improvements in Ms. Wesley's functioning in the following 12 months. (Doc. 9-8, p. 171).

*Dr. Steven Dobbs's Psychological Evaluation*

On February 4, 2019, Dr. Steven D. Dobbs performed a mental residual functional capacity assessment of Ms. Wesley based on her medical records. (Doc. 9-4, p. 15). Dr. Dobbs indicated that Ms. Wesley had no understanding or memory limitations, but she had limitations in her ability to sustain concentration and persistence. (Doc. 9-4, p. 15). Dr. Dobbs indicated that Ms. Wesley was not significantly limited in her ability to carry out very short and simple instructions, her ability to sustain an ordinary routine without special supervision, or her ability to make simple work-related decisions. (Doc. 9-4, p. 15). Dr. Dobbs indicated that Ms. Wesley displayed moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for an extended period, perform activities within a schedule, maintain regular attendance and be punctual, work in coordination and in proximity to others, and complete a normal workday and workweek without psychologically based symptoms interruptions. (Doc. 9-4, p. 15). Dr. Dobbs explained that Ms. Wesley was "[a]ble to sustain attention/concentration for two hour periods to complete simple/detailed tasks during a regular workday at an acceptable pace and attendance schedule." (Doc. 9-4, p. 15). Dr. Dobbs added that Ms. Wesley's proximity to others "shouldn't be intense." (Doc. 9-4, p. 15).

Dr. Dobbs opined that Ms. Wesley had social interaction limitations, noting that she displayed moderate limitations in her ability to interact with the public, ask

simple questions, accept instructions and criticism, and get along with coworkers or peers. (Doc. 9-4, p. 16). Dr. Dobbs indicated that Ms. Wesley was not significantly limited in her ability to maintain appropriate behavior and adhere to basic standards of neatness and cleanliness. (Doc. 9-4, p. 16). Dr. Dobbs explained that Ms. Wesley could "interact appropriately in an uncrowded work setting and respond appropriately to constructive instructions." (Doc. 9-4, p. 16).

Dr. Dobbs indicated that Ms. Wesley displayed moderate limitations in her ability to respond appropriately to changes in the work setting, but Ms. Wesley was not significantly limited in her ability to be aware of normal hazards, travel in unfamiliar places, and set realistic goals or make plans, noting that she was able to respond to at least simple and infrequent changes in routine. (Doc. 9-4, p. 16).

*Administrative Hearing*

Ms. Wesley's administrative hearing took place on February 10, 2020. (Doc. 9-3, p. 68). Ms. Wesley testified that she was 51 and a former AT&T employee. (Doc. 9-3, pp. 76-77). Ms. Wesley testified that after July of 2018, she did not believe she could perform her previous job because of the physical and mental demands of the position. (Doc. 9-3, p. 79). Ms. Wesley stated that she had memory problems such as remembering passwords, medication names, and deadlines at work. (Doc. 9-3, p. 79). Ms. Wesley attributed her memory issues to her fibromyalgia, describing her experience of brain fog. (Doc. 9-3, p. 80).

34

Ms. Wesley testified that her depression and anxiety interfered with her mental functioning.  (Doc. 9-3, p. 80).  Ms. Wesley explained that when she experienced anxiety, her body shook, she felt that she could not breathe, her heart raced, and she got "extremely freaked out."  (Doc. 9-3, p. 80).  When asked about her symptoms of depression, Ms. Wesley testified that she did not want to go outside or talk with anyone, and she could not tolerate certain noises, movements, or scents. (Doc. 9-3, p. 81).

Ms. Wesley explained that her fibromyalgia caused constant pain in her upper and lower body; she ranked her pain as 7/10. (Doc. 9-3, p. 81). Ms. Wesley testified that she had arthritis pain in her hips and lower back, but her fibromyalgia pain was more intense.  (Doc. 9-3, p. 81).  Cold and rainy weather, movement, and walking more than normal aggravated Ms. Wesley's pain.  (Doc. 9-3, p. 82).  Ms. Wesley stated that sitting and standing caused her hips and lower back to "completely lock up."  (Doc. 9-3, p. 86).  Ms. Wesley testified that she did not think there had been a time since July of 2018 that she could have maintained a job that required sitting, standing, or walking for eight hours a day.  (Doc. 9-3, p. 86).

When asked about her daily activities, Ms. Wesley testified that she was barely able to do housework due to her pain, and she could spend no more than 30 minutes at a time doing housework.  (Doc. 9-3, p. 84).  Ms. Wesley testified that she could cook something simple twice a week and grocery shop twice a month.  (Doc.

9-3, p. 84).  Ms. Wesley stated that she did not have a typical routine because she could not be sure how she might feel on a given day.  (Doc. 9-3, p. 85).  To address her pain, Ms. Wesley stated that she laid down to "stretch her body out[,]"and she took Motrin and Tylenol Arthritis.  (Doc. 9-3, p. 85).  Ms. Wesley typically laid down "around a good four hours out of the day."  (Doc. 9-3, p. 85).  Concerning Ms. Wesley's ability to drive, she testified that she could drive independently, but she seldom did.  (Doc. 9-3, p. 85).  Ms. Wesley explained that even when she used GPS and stayed close to home, she "still g[o]t turned around and miss[ed] turns" adding that she could not stay focused.  She panicked because she worried about the cars around her.  (Doc. 9-3, pp. 85-86).

Ms. Komarov, a vocational expert, testified that Ms. Wesley's past work as a user support analyst was a skilled sedentary job, and her past job as a service dispatcher was a semi-skilled sedentary job.  (Doc. 9-3, p. 87).  Ms. Komarov concluded that a hypothetical person of Ms. Wesley's age, education, past work experience, and limitations who could perform light work could not perform Ms. Wesley's past work.  (Doc. 9-3, pp. 87-88).  Ms. Komarov testified that jobs existed in the national economy for an individual of Ms. Wesley's age, education, past work experience, and RFC, such as marker, helper, and mail clerk.  (Doc. 9-3, p. 88).  Ms. Komarov testified that if the hypothetical individual was away from work for up to

four hours per workday or missed work one day per week due to an impairment, the individual would not be able to maintain employment. (Doc. 9-3, pp. 88-89).

## THE ALJ'S DECISION

The ALJ found that Ms. Wesley met the insured status requirements of the Social Security Act through December 31, 2023, and that Ms. Wesley had not engaged in substantial gainful activity since July 31, 2018, her alleged onset date. (Doc. 9-3, p. 45). The ALJ determined that Ms. Wesley suffered from the severe impairments of fibromyalgia, sarcoidosis, right shoulder degenerative joint disease, lumbar degenerative disk disease, generalized anxiety disorder, and major depressive disorder. (Doc. 9-3, p. 46). The ALJ determined that Ms. Wesley's remaining impairments of diabetes mellitus, obesity, obstructive sleep apnea, and thyroid removal were non-severe. (Doc. 9-3, p. 46). Based on a review of the medical evidence, the ALJ concluded that Ms. Wesley did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1. (Doc. 9-3, pp. 46-48).

Given these impairments, the ALJ evaluated Ms. Wesley's residual functional capacity. (Doc. 9-3, p. 49). The ALJ determined that Ms. Wesley had the RFC to perform:

light work as defined in 20 C.F.R. 404.1567(b) except she must avoid ladders, ropes and scaffolds, and must avoid unprotected heights. The claimant can occasionally stoop, kneel, crouch and crawl.  She can have occasional exposure to pulmonary irritants such as fumes, odors, dusts, and gases.  Overhead reaching on the right hand side would be limited to frequent, as would the climbing of ramps and stairs.  The claimant can understand, remember, and carryout simple instructions.   If afforded breaks every two-hours [*sic*], she can carry out tasks over an eight-hour day.  Her contact with others, to include the public, co-workers and supervisors, is limited to occasional.

(Doc. 9-3, p. 49).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone can do light work . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Wesley could not perform her past relevant work as a user support analyst or service dispatcher as actually or

generally performed.  (Doc. 9-3, p. 53).  Considering Ms. Wesley's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Ms. Wesley could perform, including a marker (DOT 209.587-034), officer helper (DOT 239.567-010), and mail clerk (DOT 209.687-026).  (Doc. 9-3, pp. 53-54).  Accordingly, the ALJ determined that Ms. Wesley was not under a disability within the meaning of the Social Security Act. (Doc. 9-3, p. 54).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment

for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

I.   Substantial  Evidence Supports the ALJ's Rejection of Ms. Wesley's Testimony Concerning the Severity of her Pain.

Ms. Wesley challenges the ALJ's reasons for rejecting her pain and limitation testimony and argues that substantial evidence does not support the ALJ's findings. (Doc. 15, p. 9). She contends that by concluding that her statements were inconsistent with the medical evidence, the ALJ mischaracterized the evidence, required objective evidence of her fibromyalgia, and did not acknowledge evidence that supported her statements. (Doc. 15, p. 9). Having reviewed the record, the

Court concludes that substantial evidence supports the ALJ's determination that Ms. Wesley's statements regarding the intensity, persistence, and limiting effects of her symptoms were not consistent with the evidence.

An ALJ uses a two-step process for evaluating an individual's symptoms. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  First, the ALJ determines "whether the individual has a medically determinable impairment . . . that could reasonably be expected to produce the individual's alleged symptoms."  SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017).  Second, if there is a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ evaluates "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017); *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  In Ms. Wesley's case, the ALJ found that her medically determinable impairments could reasonably be expected to cause some of the symptoms and functional limitations that she described, (Doc. 9-3, p. 49), but the ALJ determined that Ms. Wesley's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence. (Doc. 9-3, p. 49).

When an ALJ evaluates the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ should examine "the entire case record, including the

objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017). A claimant's statements of symptoms alone are not enough to establish an impairment or disability. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Other factors relevant to a claimant's symptoms that an ALJ considers are daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or symptoms; treatment other than medication the claimant has received for relief of pain or symptoms; any measures the claimant has used to relieve pain or symptoms; and other factors concerning the functional limitations and restrictions of the claimant due to pain and symptoms. 20 C.F.R. § 416.929. An ALJ evaluates the claimant's "statements in relation to the objective medical evidence and other evidence" and considers whether there are inconsistencies in the evidence and the claimant's statements "in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. 416.929(4).

Here, the ALJ complied with SSR 16-3p by examining the objective medical evidence; Ms. Wesley's statements about the intensity, persistence, and limiting effects of her symptoms; medical notes from reviewing doctors; medications and

other treatments to relieve Ms. Wesley's symptoms; Ms. Wesley's daily activities; and Ms. Wesley's husband's third-party function report. (Doc. 9-3, pp. 49-53). With respect to mental limitations, Dr. Stephen Dobbs's and Dr. Brian McFarland's mental examinations of Ms. Wesley were consistent and indicated only mild to moderate limitations. (Doc. 9-4, p. 16; Doc. 9-8, p. 171). The medical evidence does not show that Ms. Wesley had as extreme or marked limitations in her mental capabilities as she asserted. Similarly, the ALJ considered Ms. Wesley's objective medical evidence concerning her physical capabilities and cited an MRI that shows mild to moderate stenosis in her back on discs L2-3, L3-4, and L4-5. (Doc. 9-3, p. 50); (Doc. 9-8, p. 145). There is no objective medical evidence that shows Ms. Wesley's physical capacity is more limited than the MRI results indicate.

Substantial evidence supports the ALJ's finding that Ms. Wesley's testimony is inconsistent with her medical treatment notes. Ms. Wesley asserted that her symptoms and limitations were severe, but she frequently told her doctors that her symptoms were controlled with medication. For example, on multiple occasions, Ms. Wesley denied having joint or muscle pain. (Doc. 9-3, p. 63); (Doc. 9-8, pp. 45–46, 58, 67–68, 73–74, 79–81, 88–90, 91, 108, 123, 124, 125, 181); (Doc. 9-9, pp. 61, 75). She also denied having depression on many occasions. (Doc. 9-3, pp. 37, 63); (Doc. 9-8, pp. 45–46, 58, 67–68, 73–74, 79–81, 88–90, 91, 108, 115, 119, 123, 124, 125, 176, 181); (Doc. 9-9, pp. 3, 75). The same is true for anxiety. (Doc. 9-3,

pp. 37, 63); (Doc. 9-8, pp. 45–46, 58, 67–68, 73–74, 79–81, 88–90, 91, 111, 123, 176, 181).   The medical evidence supports the ALJ's determination that Ms. Wesley's testimony regarding the persistence, intensity, and limiting effect of her symptoms is inconsistent with the medical evidence.

The ALJ considered Ms. Wesley's treatment of her impairments, medications, effectiveness of medication, and medical treatment notes when evaluating the intensity, persistence, and limiting effects of her symptoms.  (Doc. 9-3, pp. 49–53). Ms. Wesley argues that neither the ALJ nor the Commissioner is a medical expert qualified to determine what course of treatment is or is not appropriate.  (Doc. 19, p. 7).  That is so, but the regulations direct an ALJ to consider the claimant's medication dosages and treatments when evaluating the intensity, persistence, and limiting effects of the claimant's symptoms.   20 C.F.R. § 416.929.   The ALJ properly considered the treatments and medications Ms. Wesley used for her symptoms and noted that the treatments and medications controlled her symptoms well.  (Doc. 9-3, p. 52).  Substantial evidence supports that conclusion.  For example, Ms. Wesley reported that the epidural blocks and steroid injections helped her pain.  (Doc. 9-3, p. 30).  Likewise, when Ms. Wesley began taking Cymbalta for her depression, she was less depressed, ranked her depression a three out of ten and a five out of ten on two separate psychiatry visits, and had a brighter effect on multiple occasions.  (Doc. 9-8, pp. 135, 137, 149, 150, 151, 175); (Doc. 9-9, pp. 2, 35, 37, 38, 40).  Similarly,

Ms. Wesley's pain improved or was well-managed on multiple occasions with the use of prescription drugs and physical therapy. (Doc. 9-3, p. 60); (Doc. 9-8, pp. 115, 119, 121, 123, 124, 133, 151); (Doc. 9-9, pp. 3, 75).

The ALJ properly considered Ms. Wesley's daily activities and cited to Dr. McFarland's finding that Ms. Wesley reported performing basic ADLs independently. (Doc. 9-8, p. 170). Ms. Wesley reported that she could drive independently, she cooked two meals per week, did laundry, attended church services, checked on her elderly parents, and cleaned her house twice per week without bending over. (Doc. 9-8, p. 170). *Parks v. Comm'r of Soc. Sec*., 353 Fed. Appx. 194, 197 (11th Cir. 2009) (holding that the claimant's ability to take care of her personal needs such as running errands, driving, attending church, cooking, and cleaning supported the ALJ's conclusion to discredit the claimant's pain testimony).

Ms. Wesley argues that the ALJ's decision to discount her fibromyalgia pain, symptoms, and limitations is not supported by substantial evidence. (Doc. 15, p. 15). The record demonstrates that Ms. Wesley's fibromyalgia symptoms were significant, and she consistently sought treatment for them, but substantial evidence in the record also indicates that those symptoms were controlled relatively well with medication and that her physicians routinely adjusted her prescription medications to address fluctuations in her symptoms. Before an ALJ may find a claimant disabled from fibromyalgia, there must be "sufficient objective evidence to support

a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." SSR 12-2p, 2012 WL 3017612, at *43641 (July 25, 2012). Ms. Wesley's medical records do not present objective medical evidence that indicates that her fibromyalgia limited her functional abilities so significantly that she was disabled. Records of Ms. Wesley's physical examinations routinely indicated that Ms. Wesley did not experience joint rubor, calor, or swelling or synovitis. (Doc. 9-8, pp. 115, 117, 119, 120, 121, 123, 124, 125, 133, 135, 137). When visiting her physicians, Ms. Wesley repeatedly denied joint and muscle pain. (Doc. 9-3, p. 63); (Doc. 9-8, pp. 45–46, 58, 67–68, 73–74, 79–81, 88–90, 91, 108, 123, 124, 125, 181); (Doc. 9-9, pp. 61, 75). Likewise, on multiple occasions, Ms. Wesley reported that her pain improved or was manageable with epidural injections, prescription drugs, and physical therapy. (Doc. 9-3, pp. 30, 60); (Doc. 9-8, pp. 115, 119, 121, 123, 124, 133, 151); (Doc. 9-9, pp. 3, 75). The ALJ accounted for Ms. Wesley's functional limitations in her RFC. Thus, substantial evidence supports the ALJ's analysis of Ms. Wesley's fibromyalgia.

The ALJ noted that, in evaluating Ms. Wesley's testimony about her pain and limitations, he considered Ms. Wesley's husband's third-party function report. (Doc. 9-3, p. 52). Under governing regulations, the ALJ did not have to explain in detail how he weighed that evidence. 20 C.F.R. § 1520c(d). Therefore, the ALJ's

failure to articulate how he considered the third-party function report is not reversible error. (Doc. 9-3, p. 52).

In sum, substantial evidence supports the ALJ's assessment of Ms. Wesley's testimony regarding her subjective pain and limitations. To be sure, the ALJ's analysis is unsatisfactory because the ALJ cited only evidence that was favorable to his decision and inaccurately characterized some of the evidence in the record as unremarkable. Ms. Wesley suffers with serious medical conditions and depression and anxiety. As noted, she has worked diligently with her physicians to manage her symptoms. But the Court must apply the standard of review that governs administrative appeals, and substantial evidence in the record supports the ALJ's conclusion that Ms. Wesley is not disabled because she can manage her symptoms with medication and therapy.

## II.   Substantial Evidence Supports Ms. Wesley's RFC.

Ms. Wesley argues that her RFC does not rest on substantial evidence because the RFC is incomplete. (Doc. 15, pp. 4, 18). Ms. Wesley contends that the ALJ found the opinion of Dr. Dobbs persuasive but omitted from her RFC Dr. Dobbs's recommended limitations for change and proximity to others without explaining the omission. (Doc. 15, pp. 4, 18). Dr. Dobbs reported that Ms. Wesley's proximity to others should not be intense, and that she could respond to at least simple/infrequent changes in routine. (Doc. 9-4, p. 16). The mental limitations in Ms. Wesley's RFC

state that she can "understand, remember, and carryout simple instructions," and "[i]f afforded breaks every two-hours, she can carry out those tasks over an eight-hour day.  Her contact with others, to include the public, co-workers and supervisors, is limited to occasional."  (Doc. 9-3, p. 49).

The "determination of residual functional capacity is within the authority of the ALJ and the assessment should be based upon all of the relevant evidence of a claimant's remaining ability to do work despite her impairments."  *Beech v. Apfel*, 100 F. Supp. 2d 1323, 1330 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  "The 'mere existence' of an impairment is insufficient to establish limitations on a claimant's ability to work or to undermine the ALJ's RFC finding."  *Chiappini v. Comm'r of Soc. Sec.*, 737 Fed. Appx. 525, 529 (11th Cir. 2018).  In making an RFC assessment, an ALJ does not have to articulate how he considered every medical opinion from a medical source. 20 C.F.R.§ 404.1520(c)(b)(1); *Lewen v. Comm'r of Soc. Sec.*, 605 Fed. Appx. 967, 968-69 (11th Cir. 2015); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision enables the district court to conclude that the ALJ considered the claimant's medical condition as a whole." *Adams v. Comm'r of Soc. Sec. Admin.*, 586 Fed. Appx. 531, 533 (11th Cir. 2014). An ALJ's RFC finding is sufficiently detailed if substantial evidence supports the

ALJ's RFC assessment.  *Castel v. Comm'r of Soc. Sec.*, 355 Fed. Appx. 260, 263 (11th Cir. 2009).

The ALJ's analysis of Ms. Wesley's RFC is adequate, and the ALJ's explanation of his RFC analysis is sufficient.  The ALJ explained that Dr. Dobbs found that (1) Ms. Wesley would be able to sustain attention and concentration for two-hour periods to complete simple/detailed tasks during a regular workday at an acceptable pace and attendance schedule, (2) proximity to others should not be intense, (3) Ms. Wesley could interact appropriately in an uncrowded work setting, (4) Ms. Wesley could respond appropriately to constructive instructions, and (5) Ms. Wesley could respond to at least simple and infrequent changes in routine.  (Doc. 9-3, p. 51).  The ALJ stated that he found Dr. Dobbs's opinion persuasive and that the medical records support Dr. Dobbs's finding of mild limitation in understanding, remembering, or applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a moderate limitation in adapting or managing oneself.  (Doc. 9-3, p. 52).[8]  The ALJ adequately explained the extent to which he found Dr. Dobbs's evaluation of Ms. Wesley's mental functioning persuasive and how he considered this evaluation in

---

[8] Dr. McFarland similarly concluded that Ms. Wesley would have mild to moderate limitations in her ability to understand, carry out, remember instructions, and respond appropriately to supervision, coworkers, and her ability to tolerate work pressures in a work setting.  (Doc. 9-8, p. 171).

Ms. Wesley's RFC determination.  Thus, the ALJ's analysis of Ms. Wesley's RFC is not contrary to the law.

Viewed from a wider lens, an RFC assessment rests on all relevant evidence of a claimant's ability to do work despite his impairments.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. 404.1545(a)).  "Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)."  *Brightmon v. Soc. Sec. Admin., Comm'r*, 743 Fed. Appx. 347, 352 (11th Cir. 2018).  In determining Ms. Wesley's RFC, the ALJ considered not only Dr. Dobbs's opinions but also Dr. McFarland's evaluation, Grayson & Associates' treatment notes, physicians' treatment notes, Ms. Wesley's medication, her statements about her limitations, and her ADLs.  (Doc. 9-3, pp. 50–53).[9]  An ALJ does not have to adopt or give controlling weight to a particular medical opinion.  20 C.F.R. 404.1520(c)(a).  Because substantial evidence supports Ms. Wesley's RFC, the ALJ's failure to include proximity and change limitations is

---

[9] With respect to her ADLs, Ms. Wesley reported that, among other tasks, she takes care of her elderly mother and her grandchildren, manages the family finances, and manages her medications on her own.  (Doc. 9-8, pp. 153, 170); (Doc. 9-9, pp. 31, 39).  Substantial evidence supports the ALJ's finding that the medical evidence does not show extreme or marked limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  (Doc. 9-3, p. 52).  Again, the ALJ did not acknowledge limitations in Ms. Wesley's ADLs like her testimony that, while she could drive, she did so infrequently because of her anxiety.  Precedent requires a complete discussion of ADLs, but the ALJ's error in this regard on the record in this case is harmless.

not reversible error.  *See Castel v. Comm'r of Soc. Sec.*, 355 Fed. Appx. 260, 263 (11th Cir. 2009); *see also Freeman v. Barnhart*, 220 Fed. Appx. 957, 960 (11th Cir. 2007) (noting that while the ALJ could have been more specific and explicit in his findings, he considered all of the evidence and the claimant's functional limitations, so he adequately analyzed and described the claimant's RFC).

## CONCLUSION

Substantial evidence supports the ALJ's decision in this case, and the ALJ employed the proper legal standards to come to his decision.  This Court may not re-weigh the evidence or substitute its judgment for the judgment of the Commissioner.  Accordingly, the Court affirms the Commissioner's decision.

**DONE** and **ORDERED** this August 22, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE